UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION

**Walhonde Tools, Inc.,**

    **Plaintiff,**                          :         Case No. 2:19-cv-1009

    **v.**                                    **Judge Sarah D. Morrison**
                                       :         **Chief Magistrate Judge Elizabeth P. Deavers**

**Bear Clamp Company, LLC,** *et al.*

    **Defendants.**

## **OPINION AND ORDER**

This matter is before the Court for the construction of various terms in a patent. The parties submitted briefs in support of their proposed constructions, (ECF Nos. 28, 30, 31, 32), and on April 23, 2020, the Court held a claim construction hearing during which counsel for the parties presented arguments in support of their proposed constructions, (ECF No. 35). Relying on the parties' briefs, evidence, and oral arguments, the Court now construes each of the disputed terms.

**I.  BACKGROUND**

Plaintiff Walhonde Tools, Inc., ("Walhonde") manufactures and markets tube and pipe alignment tools used in heavy industrial construction projects. (Compl. ¶ 15, ECF No. 1.) In 2014, Matthew McClure, the son of Walhonde's founders, submitted an application for U.S. Pat. No. 9,808,893 (the "'893 Patent") entitled "Apparatus for Aligning Sections of Pipe." (*Id.* ¶¶ 17–18.) In 2017, the United States Patent and Trademark Office (the "PTO") issued the '893 Patent, although by this point Mr. McClure had assigned the patent to Walhonde. (*Id.* ¶¶ 18–19.) Walhonde's Complaint alleges, among other things, that Defendant Bear Clamp Company, LLC, ("Bear Clamp") has sold devices that infringe Claim 1 of the '893 Patent. (Compl. ¶¶ 32–47.)

**II.     STANDARD OF REVIEW**

Construing the scope of a patent is a question of law to be determined by the Court. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 384 (1996). As a part of this process, it is the role of the Court to make any subsidiary factual findings necessary to construe the claims. *Teva Pharm. USA, Inc. v. Sandoz, Inc.*, 574 U.S. 318, 332 (2015). Once the Court has determined the scope of the patent, it is then up to the finder of fact to decide whether infringement has occurred. *Markman*, 517 U.S. at 384. The Court need not accept either party's construction of a disputed term. *Bancorp Servs., LLC v. Sun Life Assurance Co. of Canada (U.S.)*, 687 F.3d 1266, 1274 (Fed. Cir. 2012).

The claim construction analysis begins with the words of the claim. *Old Town Canoe Co. v. Confluence Holdings Corp.*, 448 F.3d 1309, 1315 (Fed. Cir. 2006). "The words of a claim 'are generally given their ordinary and customary meaning.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (en banc) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed Cir. 1996)). "[T]he ordinary and customary meaning of a claim term is the meaning that the term would have to a person of ordinary skill in the art" ("POSITA") at the time the patent was filed. *Id.* at 1313. The claim term must be read not only in the context of the claims where the disputed term appears but in the context of the entire patent and of the broader field. *Id.*

"[T]he claims themselves provide substantial guidance as to the meaning of particular claim terms." *Id.* at 1314. In particular, the context in which the term is used "can be highly instructive." *Id.* "Other claims of the patent in question, both asserted and unasserted," can also help interpret a term, "[b]ecause claim terms are normally used consistently throughout the patent . . . ." *Id.*

2

The claims must always be read in the context of the specification, which "is the single best guide to the meaning of a disputed term" and is usually dispositive. *Id.* at 1315. In some cases, the specification may reveal that a claim term is given an idiosyncratic meaning. *Id.* at 1316; *accord Teleflex, Inc. v. Ficosa N. Am. Corp.*, 299 F.3d 1313, 1325 (Fed. Cir. 2002) ("[A]n inventor may choose to be his own lexicographer . . . ."). Nevertheless, the specification cannot override the claim language itself. "For instance, although the specification often describes very specific embodiments of the invention," the claims should not be confined only to those embodiments because POSITAs "rarely would confine their definitions of terms to the exact representations depicted . . . ." *Phillips*, 415 F.3d at 1323. In sum, "'[t]he construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction.'" *Id.* at 1316 (quoting *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed Cir. 1998)).

In construing the claims, the reviewing court should also consider the patent's prosecution history. *Id.* at 1317. "[L]ike the specification, the prosecution history was created by the patentee in attempting to explain and obtain the patent[,]" although the prosecution history is less useful than the specification in construing the claims. *Id.*

In addition to this "intrinsic evidence," a district court may also rely on extrinsic evidence, which "'consists of all evidence external to the patent and prosecution history, including expert and inventor testimony, dictionaries, and learned treatises.'" *Id.* (quoting *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995) (en banc), *aff'd*, 517 U.S. 370). "However, while extrinsic evidence 'can shed useful light on the relevant art,' . . . it is 'less significant than the intrinsic record in determining the legally operative meaning of claim language.'" *Id.* (quoting *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir.

3

2004)). Technical dictionaries in particular can help a court to understand the underlying technology and how a POSITA might use the claim terms. *Id.* at 1318; *see also Teva*, 574 U.S. at 326. "Such evidence . . . may be considered if the court deems it helpful in determining" the meaning of the claims, but it is not as reliable as intrinsic evidence. *Phillips*, 415 F.3d at 1318. Extrinsic evidence must only be considered in the context of the intrinsic evidence. *Id.* at 1319.

## III. ANALYSIS

The parties dispute the meaning of three terms in Claim 1—"hinge," "pivotally coupling," and "turnbuckle assembly[ies]." It is thus these three terms that require construction by the Court.

### A. Term one - "Hinge"

Walhonde contends that the proper construction of "hinge" is a "structure that allows the first clamp member to pivot with respect to the second clamp member." Bear Clamp contends that the proper construction is a "structure that allows the first clamp member and the second clamp member to pivot so that they can open and close a meaningful distance, i.e., not a latch or clamp."

In the Court's view, there are two ways in which these constructions differ, the first being which aspects of the invention pivot and the second being the degree to which they pivot. As to the first, Walhonde's construction contemplates that the first clamp member pivots while the second clamp member remains stationary. Bear Clamp's construction contemplates that both clamp members have the ability to pivot. The ordinary meaning of "hinge" can encompass either construction. For example, a door hinge allows a door to pivot with respect to the wall, while the wall does not move. But a hinge on a privacy screen, for example, allows the panels on either side of the hinge to pivot.

4

In this context, Walhonde's construction cannot be correct because the specification explicitly contemplates pivoting by both clamp members. *See* '893 Patent at col. 4, lines 29–32 ("Each one of the first clamp member [] and the second clamp member [] can be pivotable between an open position . . . and a closed position . . . ." ). That is, while it might be the case that in some embodiments only the first clamp member pivots, it cannot be the case that in *all* embodiments only the first clamp member pivots. The same language in the patent specification supports the idea that only one clamp member needs to be able to pivot, and Bear Clamp, for its part, offers no explanation for why both clamp members must be able to do so. The Court thus concludes that "hinge" must be construed in light of the specification's language indicating that one or both clamp members must be able to pivot.

Turning to the second way in which the parties' constructions differ, Walhonde's construction contains no limitation regarding the degree of pivoting while Bear Clamp's requires that the clamp members open and close "a meaningful distance." This limitation is unnecessary for two reasons.

First, Walhonde correctly points out that such a limitation finds no support in the claims or in the patent specification. Bear Clamp responds that its construction is necessary because of Walhonde's "bewildering" infringement allegations. But there is no principle of claim construction (and Bear Clamp cites to none) that a claim can be construed in a more unusual and less textually bound manner based on the validity (or perceived invalidity) of a plaintiff's infringement claim. If anything, the opposite is true. *Cf. NeoMagic Corp. v. Trident Microsys., Inc.*, 287 F.3d 1062, 1074 (Fed. Cir. 2002) ("It is well settled that claims may not be construed by reference to the accused device.").

5

Second, Bear Clamp argues that this distance limitation is necessary to distinguish a hinge from a clamp or a latch. But ordinary language already allows these terms to be distinguished from one another, so no additional distinction is required to accomplish this purpose. Both parties' constructions acknowledge that a hinge connects two things and allows one or both of those things to pivot from the hinge point, as here. Meanwhile, Bear Clamp acknowledges that in their simplest forms, a latch or clamp fastens two things together. (Def. Opening Claim Construction Brief, ECF No. 28, at 10–11, 13.) Simply put, Bear Clamp is wrong that a hinge could be confused with a latch or a clamp if it does not open "a meaningful distance."

However much or little a hinge allows something (or somethings) to open, what makes it a hinge is the pivot point, and it remains a hinge even if that pivot range is very small. Even if a latch or a clamp has a pivot point, that pivot point would not affect the fundamental identity of the latch or clamp. It is the ability of the latch or the clamp to connect two things or hold them together (i.e., their latching or clamping capability) that defines them. In other words, while a latch or clamp might *have* a hinge, there are other aspects of a latch that would make it a latch (or a clamp a clamp) rather than a hinge.[1] Bear Clamp puts it differently but at the same time acknowledges the fundamental difference inherent in these terms by recognizing that a hinge allows things to open and close, while a latch or a clamp allows things to remain in a closed position. (ECF No. 28, at 13 ("[A] latch that is intended to secure the jaws in a closed position is very different from a hinge that allows the jaws to be opened and then closed . . . .").) This distinction is recognition of the incorrectness of Bear Clamp's position.

---

[1] For example, Walhonde points out that there is such a thing as a "latch hinge." This is a device that combines a latch and a hinge. *See* https://www.sdproducts.com/latch-hinges.html. But while this device has a latch component and a hinge component, each is distinct, if part of the same device.

6

Bear Clamp's construction appears to be rooted in a concern that a latch could become a hinge under Walhonde's definition if the latch, when loosened, allows for minimal movement. (*Id.*) Notably, Walhonde disclaimed this possibility at oral argument. (Tr. of Claim Construction Hr'g, 26:20–27:4.) The Court also does not consider this to be a realistic concern. While loosening a latch might allow for some movement, it still would not allow the latched components to pivot as would be necessary to make the latch a hinge. Consider the example of a gate with a hinge and a latch. The hinge allows the gate to swing open and closed. The latch allows the gate to remain closed. Even though one could rattle the gate while it was latched, that movement would come about because of the hinge, not the latch, and that minimal movement would not make that hinge any less a hinge. No matter how much one were to loosen the latch, that swinging (i.e., pivoting) movement could only come about because of the hinge.[2] While a loose latch might allow for some lateral movement of the fence, there would be no pivoting as is required by a hinge (and Walhonde's definition).

Bear Clamp also argues that Walhonde's definition encompasses anything that can "serve as a hinge," which would make "hinge" a "means plus function" term. (Def. Responsive Brief, ECF No. 31, at 5–6 (emphasis deleted).) This is not so. The means-plus-function limitation applies only to "purely functional limitations that do not provide the structure that performs the recited function." *Phillips*, 415 F.3d at 1311. And the absence of the word "means" in conjunction with a claim limitation creates a rebuttable presumption that it is not a means-plus-function limitation. *Id.* The "presumption can be rebutted 'by showing that the claim element recite[s] a function without reciting sufficient structure for performing that function.'" *DePuy*

---

[2] Importantly, while the latch *itself* might pivot, it does not allow the latched item(s) to pivot.

*Spine, Inc. v. Medtronic Sofamor Danek, Inc.*, 469 F.3d 1005, 1023 (Fed Cir. 2006) (alteration in original) (quoting *Watts v. XL Sys. Inc.*, 232 F.3d 877, 880 (Fed. Cir. 2000)).

This presumption is a strong one, *id.*, and it is not overcome here because the "hinge" limitation includes the pertinent structure (i.e., "an elongated portion having a first aperture and a second aperture . . . ."). '893 Patent at col. 15, lines 62–64. Because of the structural limitations in Claim 1, Bear Clamp is wrong that Walhonde's proposed construction is so broad that it would encompass any structure that performs a hinging function. Bear Clamp's claim that any hinge could potentially infringe on Walhonde's patent ignores the other limitations in the claim.

Accordingly, the Court construes a "hinge" to be a structure that allows the first clamp member and/or the second clamp member to pivot with respect to the other clamp member.

      **B.**     **Term two - "pivotally coupling"**

The second disputed term, "pivotally coupling," is analyzed in an almost identical way to the first. Walhonde's proposed construction is: "connecting in a way that allows for relative rotation." Bear Clamp's is: "connected in a way that allows for rotation relative to each other a meaningful distance." The distinction between the two constructions is Bear Clamp's "meaningful distance" requirement.

As with the construction of "hinge," there is no basis in the claim or specification to add a "meaningful distance" requirement, and such a limitation is not necessary to avoid blurring the lines between a hinge and a latch. The key distinction that a hinge causes pivoting while a latch does not is further demonstrated by the fact that the claim refers to "pivotally coupling" rather than merely "coupling." "Pivotally coupling" requires not just a connection (i.e., a "coupling"), but also a pivot point. Such a pivot point is necessary for a hinge but not for a latch.

The fact that "pivot" itself means relative rotation is bolstered by the fact that the parties have agreed that "pivot member" refers to a "structure that provides the point about which [an]other structure can rotate." (Joint Claim Construction and Prehearing Statement, at 1, ECF No. 25.) Accordingly, the Court agrees that Walhonde's construction of "pivotally coupling" is correct.

### C. Term three - "turnbuckle assembly[ies]"

Walhonde's proposed construction for the third disputed term, "turnbuckle assembly[ies]," is: "structures that may be used to adjust the distance between two other structures."[3] Bear Clamp's is: "combination of a threaded rod having a fixed central structure and clevises threaded to the ends of the rod."

The Court finds that neither party's construction is correct. Walhonde's construction is too broad. The term "turnbuckle assembly," at a minimum, must contain a turnbuckle. It simply cannot be defined as *any* structure that can adjust the distance between any other two structures. Bear Clamp's construction, on the other hand, is too narrow. It violates the admonition that claims should not be construed to be confined to the exact representations depicted in the embodiments. *See Phillips*, 415 F.3d at 1323.

At the claim construction hearing, Walhonde sought to equate "turnbuckle" with "turnbuckle assembly." (Tr. of Claim Construction Hr'g, 41:19–21.) This would read "assembly" out of the patent, which cannot be so for two reasons. First, as a matter of language, it does not make sense to construe the claim to render "assembly" superfluous. *See Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950 (Fed. Cir. 2006) ("[C]laims are interpreted with an eye toward giving

---

[3] At the claim construction hearing, for the first time, Walhonde stated that it did not believe this third term requires construction. (Tr. of Claim Construction Hr'g, 32:18–21.) Walhonde has waived this argument by not raising it in its briefing, but in any event, the Court disagrees. While "turnbuckle" does not require construction, "turnbuckle assembly" does.

9

effect to all terms in the claim."); *Phillips*, 415 F.3d at 1314 ("[T]he claim in this case refers to 'steel baffles,' which strongly implies that the term 'baffles' does not inherently mean objects made of steel."). Second, Bear Clamp points out, and Walhonde does not dispute, that Walhonde has previously used "turnbuckle" in an earlier patent. (Tr. of Claim Construction Hr'g 37:16–19.) Walhonde thus knows how to use the word "turnbuckle" when it means a simple turnbuckle. This further demonstrates Walhonde's intent in the '893 Patent to use "turnbuckle assembly" to distinguish from a simple turnbuckle.

Having established that a turnbuckle assembly is not a turnbuckle, the question of what exactly a turnbuckle assembly is remains. A "turnbuckle" is "[a] device for adjusting the tension in a cable, rope, structural element, etc. [that] consists of two threaded eyelets screwed into opposite ends of a metal loop. The threads at opposite ends have opposite hands so that rotating the loop either tightens or loosens the item under tension." Tony Atkins & Marcel Escudier, *Turnbuckle*, Oxford Dictionary of Mechanical Engineering (2013), Oxford Reference 9780191752308. This definition provides a baseline for understanding the meaning of "turnbuckle assembly" because a POSITA would understand a turnbuckle as being consistent with this definition. Meanwhile, the plain meaning of "assembly," in this context, appears to refer to a "collection of parts." *See* Merriam-Webster, https://www.merriam-webster.com/dictionary/assembly (last visited May 6, 2020); Christopher Gorse, David Johnston, & Martin Pritchard, *assembly*, Oxford Dictionary of Construction, Surveying and Civil Engineering (2020), Oxford Reference 9780191871061. The question, then, is whether the "collection of parts" refers to 1) a collection of turnbuckles, 2) a collection of parts comprising a turnbuckle, or 3) a collection of parts of which a turnbuckle is one of the parts.

10

Based on the specification, the third option is the best fit. This is primarily based on figures 10 and 11, which depict a "turnbuckle assembly." *See* '893 Patent at col. 3, lines 29–32. These figures show only one turnbuckle, so option one cannot be correct. (ECF No. 25-1, at 14–15.) And they show more than just a turnbuckle, so option two cannot be correct either. (*Id.*) Accordingly, a turnbuckle assembly must consist of a turnbuckle plus something else. The specification and the prosecution history shed light on what this "something else" must be.

First, the specification. Figures 10 and 11 consist of four main parts – a rod ($32^4$), a torqueing member (34) and two clevises (40, 42), each of which contains a threaded bore (45, 47) and an aperture (87). (*Id.*) The rod and torqueing member comprise the turnbuckle, because this is the portion of the device that adjusts the tension, while the clevises are the "something else."

This observation is also consistent with the prosecution history, which describes another patent ("Podell") involving a turnbuckle assembly having a first clevis, a second clevis, a rod, and a torqueing member secured to the rod. U.S. Patent Application No. 15/805,981, at 6 (ECF No. 25-1, Tab 3). This is indicative of what a POSITA would understand a turnbuckle assembly to be, and it supports the Court's conclusion that a turnbuckle assembly must consist of a turnbuckle, plus two clevises.

While this construction is similar to Bear Clamp's, it is broader. Bear Clamp's construction requires a specific type of turnbuckle (a threaded rod with a fixed central structure) and mandates that the clevises be threaded to the end of the rod. As explained, this construction cannot be correct because it confines the scope of the patent claim to the embodiment. But this construction also cannot be correct because it would render much of Claim 15 superfluous.

---

[4] The parenthetical numbers are the numbered labels in the specification.

11

"Other claims of the patent in question, both asserted and unasserted, can . . . be valuable sources of enlightenment as to the meaning of a claim term." *Phillips*, 415 F.3d at 1314. This is "[b]ecause claim terms are normally used consistently throughout" a patent." *Id.* And claim terms should be construed so as not to render words in other claims superfluous. *See Arlington Indus. v. Bridgeport Fittings, Inc.*, 632 F.3d 1246, 1254–55 (Fed. Cir. 2011) (finding that where a term can be found in multiple claims and is accompanied by a modifier in one claim, that modifier should not be read into the unmodified claim).

The apparatus described in Claim 15 refers to "a plurality of turnbuckle assemblies, each one of the turnbuckle assemblies comprising a rod and a torquing [sic] member secured to the rod, each one of the turnbuckle assemblies further comprising a first clevis and a second clevis, each one of the first clevis and the second clevis being threadedly engaged with the rod . . . ." Bear Clamp's construction of "turnbuckle assemblies" would render much of this claim superfluous, because if the features identified by Bear Clamp already define what a turnbuckle assembly is, it would not make sense to say that a turnbuckle assembly *comprises* these features.

Accordingly, the Court construes a "turnbuckle assembly" to be a turnbuckle combined in some manner with two clevises.

## IV. CONCLUSION

For the reasons stated, the parties shall construe the contested terms in the '893 Patent as set forth above.

**IT IS SO ORDERED**.

/s/ Sarah D. Morrison  
**SARAH D. MORRISON**  
**UNITED STATES DISTRICT JUDGE**